UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 07-20438-HOEVELER/GARBER

ROBERT PARDO,

    Plaintiff,

v.

JANET NAPOLITANO, Secretary
of the Department of
Homeland Security,

    Defendant.

<u>ORDER AND REASONS</u>

BEFORE the Court is the defendant's motion for summary judgment.[1] The motion has been fully briefed and is ready for a decision. For the reasons that follow, the motion is GRANTED.

<u>Background</u>

In 1992 Robert Pardo began working as a "detention enforcement officer" for the Department of Homeland Security (then known as the Immigration and Naturalization Service) at the Krome Processing Center in Miami. His job was designated as a "law enforcement" position, also known as a "covered" position, because it required law enforcement skills and frequent contact with detained aliens. Covered employees receive a beneficial salary and can retire at age 50 with 20 years of service, compared to "non-covered" employees who can retire at age 56 after 30 years of service.

---

[1]Originally, the plaintiff filed suit against Michael Chertoff in his official capacity as Secretary of the Department of Homeland Security. Janet Napolitano in her official capacity as Secretary of the Department of Homeland Security is substituted for Defendant Michael Chertoff.

On August 17, 2001, Pardo injured his wrist while trying to restrain a combative detainee. He underwent surgery in October 2001 but recovered only minimal use of his left hand. While Pardo was recovering, Homeland Security assigned him to a "light duty" job in Krome's control room. Although the position did not involve interacting with detainees, Pardo nevertheless asked to be moved to a more remote post because the control room itself was located too close to the detainee isolation area.[2] Pardo was reassigned to the personnel office and then to the engineering room. In July 2002, doctors instructed him that his wrist disability was permanent and he should not return to working with detainees, because he would be unable to restrain them or defend himself. Homeland Security offered Pardo a job as a "detention and deportation assistant" (DDA), which is not a covered position.[3] According to the job description, DDAs "provide a variety of administrative and technical support duties for the Detention and Removal program," using computers and software to perform eleven "Major Duties" that are almost exclusively administrative. Pardo initially declined the

---

[2]At his deposition, Pardo explained that, "[e]very time there was a problem, [the detention enforcement officers] would walk [the detainee] through the lobby, past [the control room], back to isolation, which is right behind the control center."

[3]Linda Harris-Williams, a human resources specialist at Krome, testified she does not know if Pardo's "law enforcement covered years would count towards his retirement as a non-law enforcement." Although there is also a salary difference between DDA and detention enforcement officer, the Department of Labor pays Pardo the difference.

offer, explaining in a letter to Krome's work compensation department that the job involved too much detainee contact. But Pardo later accepted and filed an administrative claim of employment discrimination.[4] Homeland Security denied the claim in November 2002 and the EEOC upheld the decision, informing Pardo he had 90 days to file a civil complaint in federal court, which he did.

In Count I of the two-count complaint, Pardo asserts an employment discrimination claim under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* Specifically, Pardo contends that some of his non-Hispanic co-workers at Krome were allowed to retain their law enforcement jobs despite having permanent disabilities that prevented them from having detainee contact. In Count II, Pardo asserts a claim under the Rehabilitation Act of 1973, 29 U.S.C. § 794, *et seq.*, based on Homeland Security's failure to accommodate his disability by giving him a permanent "light duty" law enforcement job. The Department of Homeland Security now moves for summary judgment, arguing that Pardo has not and cannot present evidence to support his claims.

## I. Standard

Rule 56 instructs that summary judgment is appropriate if there is no genuine issue of material fact such that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P.

---

[4] In fact, detainee contact is a marginal and insignificant aspect of the detention & deportation assistant job, at most.

56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-24 (1986).
"Genuine disputes are those in which the evidence is such that a
reasonable jury could return a verdict for the non-movant. For
factual issues to be considered genuine, they must have a real
basis in the record." <u>Mize v. Jefferson City Bd. of Educ.</u>, 93 F.3d
739, 742 (11th Cir. 1996) (citations and quotations omitted). On a
motion for summary judgment, the Court reviews the record, and all
its inferences, in the light most favorable to the nonmoving party.
<u>Holbrook v. City of Alpharetta, Georgia</u>, 112 F.3d 1522 1526 (11th
Cir. 1997).

## II. <u>Rehabilitation Act claim</u>

### A.

The Court first considers Mr. Pardo's claim under the
Rehabilitation Act, which prohibits federal agencies from
discriminating against any otherwise qualified individual with a
disability solely by reason of his or her disability. 29 U.S.C. §
794(a).[5] A plaintiff may prove discrimination in two ways,
disparate treatment and a failure to make a reasonable
accommodation. <u>Nadler v. Harvey</u>, 2007 WL 2404705 *4 (11th Cir.
2007) (unpublished). Disparate treatment involves discriminatory
intent and occurs when a disabled individual is treated differently
than a non-disabled or less disabled individual because of his

---

[5] The standard for determining liability under the
Rehabilitation Act is the same as that under the Americans with
Disabilities Act, 42 U.S.C. § 12101, *et seq.* <u>Cash v. Smith</u>, 231
F.3d 1301, 1305 (11th Cir. 2000).

disability. Id. By contrast, a failure to make reasonable accommodation claim "requires no animus and occurs when a covered entity fails to fulfill its affirmative duty to 'make reasonable accommodation to the known physical or mental limitations of an otherwise qualified applicant or employee with a disability' without demonstrating that 'the accommodation would impose an undue hardship on the operation of the business.'" Id., quoting 42 U.S.C. § 12111(b)(5)(A). It is clear from Pardo's summary judgment submissions that his claim concerns Homeland Security's failure to accommodate his disability.[6]

To establish a prima facie case of discrimination, an individual must show that he: (1) has a disability; (2) is otherwise qualified for the position; and (3) was subjected to unlawful discrimination as the result of his disability. Sutton v. Lader, 185 F.3d 1203, 1207-08 (11th Cir. 1999). If establishing discrimination by failure to make reasonable accommodation, a plaintiff who satisfies the first two prongs meets the last prong merely by showing that a reasonable accommodation was not provided. Nadler at *5, citing Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1255 (11th Cir. 2001). Although Homeland Security appears to dispute all aspects of the prima facie case, the Court need only address whether Pardo was "qualified" to work as a detention

---

[6] To the extent the plaintiff seeks relief under the Rehabilitation Act for disparate treatment, this claim fails for the reasons discussed in the Title VII analysis below.

enforcement officer.

B.

Two questions must be asked to determine whether an individual is "qualified" for a job; if the answer to both questions is "Yes," then the individual is qualified. See Reed v. Heil Co., 206 F.3d 1055, 1062 (11th Cir. 2000). First, "does the individual have sufficient experience and skills, an adequate educational background, or the appropriate licenses for the job?" Id. Pardo served four years in the U.S. Air Force as a law enforcement specialist, five years as a Bureau of Prisons correctional officer, and almost ten years as an INS detention enforcement officer. There is no dispute that his law enforcement credentials are impressive and sufficient. Second, "can the individual perform the essential functions of the job, either with or without reasonable accommodations?" Id. Homeland Security argues Pardo can no longer perform the essential functions of a detention enforcement officer, with or without a reasonable accommodation, because of his permanent restriction from working with or near detainees. Thus, the Court must decide whether interacting with detainees is an essential part of the job.

The essential functions of a job include "the fundamental job duties of the employment position the individual with a disability holds or desires," but they do not include "the marginal functions

of the position." 29 C.F.R. § 1630.2(n)(1) (2001).[7] "Whether a function is essential is evaluated on a case-by-case basis by examining a number of factors." Davis v. Florida Power & Light Co., 205 F.3d 1301, 1305 (11th Cir. 2000). Those factors include (1) the employer's judgment, (2) the written job description, (3) the amount of time required to perform the function, (4) the consequences of not requiring the function to be performed, (5) the terms of any collective bargaining agreement, (6) the work experience of previous employees who performed the job, and (7) the current work experience of employees performing similar jobs. Id. Applying these factors, the Court finds that working with detainees is unquestionably an essential aspect of the detention enforcement officer position. In fact, it is the reason the job exists. The introduction to the detention enforcement officer job description provides:

> Incumbent primarily performs tasks involving the location, apprehension/arresting, transporting, safeguarding, overseeing/supervising, and processing of aliens being detained an/or deported for violation of immigration law(s). . . . The detained population contains a significant number of aliens of criminal, immoral, narcotic, subversive, and/or defective mental backgrounds who require special handling, oversight and treatment.

Of the ten "Major Duties and Responsibilities" in the job

---

[7] This definition is found in the regulations implementing Title I of the ADA. Section 501 of the Rehabilitation Act incorporates the standards applied under Title I of the ADA. See 29 U.S.C. § 791(g).

description, nearly all of them require direct handling and interaction with detainees, including booking and strip searching, providing full-service counseling, screening for medical problems, administering discipline, escorting them to and from court hearings and to penal facilities, supervising their work details, and so forth. In an attempt to create fact issues, Pardo contends the accuracy of the written job description is belied by the actual experience of two of his Krome colleagues whose law enforcement work allegedly involved limited or no detainee contact. Pardo first draws attention to detention enforcement officer Norman Azan, who had a heart attack in 1995 and spent the next four years in light-duty posts in the control room and the lobby, as well as non-light-duty posts at the main gate and the perimeter (none of which involved the kind of day-to-day direct detainee contact described in the job description). During this period, Mr. Azan provided medical reports to his supervisors every few months, and he was twice asked to take a fitness-for-duty examination to determine if he would be able to resume his ordinary job duties.[8] According to

---

[8] Mr. Azan's health reports are not in evidence. Linda Harris-Williams explained the fitness-for-duty process at her deposition: "if a supervisor comes to me and tells that an employee was on temporary duty and [the supervisor] suspects that it has been going on too long. . . he wants the person to go in for a 'fit-for-duty,' and a fit-for-duty is where Labor Relations will come up with the questions to ask the doctor about this temporary assignment, about this person's medical restriction and to tell the supervisor what [the employee] can or cannot do." If the law enforcement officer is permanently restricted from performing essential job junctions, he will be assigned to a non-law enforcement position.

Mr. Azan, he never took the fitness test, explaining that, "every time one captain [would] mention it to me then he [would] leave and go for another job then somebody else comes in and then you don't hear anything else about it." After Azan had a second heart attack in 2000, he continued working a mixture of light-duty and non-light-duty positions until 2002, at which point he resumed working with detainees in the cafeteria and in the recreation yard about 50 percent of the time. In 2004, rather than take a fitness test, Azan voluntarily resumed normal detention enforcement officer duties.

Although it appears Mr. Azan may have managed to stay on "light duty" for longer than the agency normally allows--in part by trading assignments with other officers[9] and avoiding the fitness-for-duty examination--he eventually resumed the normal law enforcement-type duties. He was not, as Pardo suggests, allowed to obtain law-enforcement benefits while working in a permanent non-law-enforcement job. Even Mr. Azan's temporary work assignments, which he managed to parlay into several years worth of work, would have been unsuitable for Mr. Pardo, who objected to working in the control room (a post that involved less detainee contact than the lobby post, according to Pardo's own description of Krome's layout).

The work experience of Jeff Weldon, a Krome employee with a

---

[9]At his deposition, Mr. Azan estimated that 95 percent of his lobby assignments came from trading with detention enforcement officers who preferred other posts.

prosthetic arm, also fails to support Pardo's contention that detainee contact is not an essential function of law enforcement. In his declaration, Mr. Weldon states that he had "daily contact" with detainees for seven years as a deportation officer and "regular contact" with detainees during his final year at Krome (before being transferred to Texas) as a supervisory deportation officer, both of which are covered positions.[10] Pardo has not introduced evidence to rebut Mr. Weldon. In fact, the evidence about other law enforcement employees at Krome confirms, rather than contradicts, Homeland Security's position that detainee contact is an essential function of the job. Pardo has failed to point to any reasonable accommodation that would allow him to perform these duties, and none is apparent, particularly given Pardo's objection even to a light-duty post in the control room.

Mr. Pardo spent much of his career in law enforcement jobs in federal agencies and was injured in the line of duty. The Court is not unsympathetic to his situation. Although one might hope Pardo's years in a "covered position" will affect his retirement benefits proportionately, the only question for the Court to decide is whether, under the statute, Pardo could perform the essential functions of law enforcement. He could not. Homeland Security did

---

[10] The is no evidence in the record about when Mr. Weldon got a prosthetic arm. He states that he "never requested that the Agency limit [his] contact with detainees" and "never requested a reasonable accommodation regarding the use of [his] prosthetic arm." Weldon Declaration, ¶¶ 8-9.

not violate the Rehabilitation Act by assigning Pardo to a clerical job.

### III. Title VII claim

In Count I, Pardo contends that he was treated less favorably than similarly situated non-Hispanic employees at Krome. He cites Mr. Azan (who is Jamaican) and Mr. Weldon as comparators, because they were allegedly allowed to retain law enforcement benefits while permanently assigned to posts without detainee contact. Pardo contends that the favorable treatment of his co-workers demonstrates that Homeland Security's "essential functions" justification for stripping his law enforcement benefits was a pretext for national-origin discrimination. For the reasons discussed above, however, the Court finds that Pardo has not met his prima facie burden under McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), to show that similarly situated employees, not of the plaintiff's protected group, were treated differently. Even if Mr. Pardo met his prima facie burden, Homeland Security introduced sufficient and un-rebutted evidence that its employment decisions were not based on race or national origin. Accordingly,

IT IS ORDERED: The defendant's motion for summary judgment is GRANTED. Final judgment will be issued by a separate order.

**DONE AND ORDERED** in Miami, Florida, October 26, 2009.

_William M. Hoeveler_

WILLIAM M. HOEVELER
UNITED STATES DISTRICT COURT JUDGE

-11-